I. I. ROSEN, M.D., Plaintiff,

v.

The **LOUISIANA STATE BOARD OF MEDICAL EXAMINERS**, Defendant.

Civ. A. No. 70–1304.

United States District Court,
E. D. Louisiana,
New Orleans Division.

Aug. 7, 1970.

Roy Lucas, New York City, Benjamin E. Smith, Smith & Scheuermann, New Orleans, La., for plaintiff.

Sam A. LeBlanc III, Adams & Reese, New Orleans, La., for defendant.

Before AINSWORTH, Circuit Judge, and CASSIBRY and BOYLE, District Judges.

AINSWORTH, Circuit Judge:

Isadore I. Rosen, a physician licensed to practice medicine under the laws of Louisiana, challenges the constitutionality of the Louisiana statute authorizing the suspension or revocation of a medical doctor's certificate when the doctor has committed or participated in the commission of an abortion that is unnecessary to the relief of a woman whose life appears in peril. He seeks an injunction restraining the Louisiana State Board of Medical Examiners (Medical Board) from enforcing La.Rev.Stat.Ann. § 37:1285 in proceedings being brought against him and a judgment declaring section 37:1285(6) unconstitutional.

This three-judge district court was convened to consider the issues raised by Dr. Rosen's complaint, 28 U.S.C. § 2281, and a hearing was held on the merits of the case. We hold that section 37:1285(6) is constitutional and deny plaintiff's request for declaratory and injunctive relief.

I.

The Louisiana Medical Practice Act, La.Rev.Stat.Ann. § 37:1261 *et seq.*, authorizes the Medical Board to suspend or institute court proceedings to revoke a doctor's certificate to practice medicine in the State when the doctor has procured or aided or abetted in the procuring of an abortion, "unless done for the relief of a woman whose life appears in peril after due consultation with another licensed physician." La.Rev.Stat. Ann. § 37:1285(6). On November 12, 1969, the Medical Board informed Dr. Rosen of its intent to conduct a hearing on charges that Dr. Rosen has on several occasions committed or aided in the commission of abortions without legal justification for so doing. A hearing was originally scheduled for December 12, 1969. This lawsuit followed. We have jurisdiction to decide the case. *E. g.,* Roe v. Wade, N.D.Tex., 1970, 314 F. Supp. 1217; Babbitz v. McCann, E.D. Wis., 1970, 310 F.Supp. 293.

██ The complaint charges that section 37:1285(6) of the Louisiana Revised Statutes is unconstitutional for violating the First, Fourth, Fifth, Ninth, and Fourteenth Amendments to the United States Constitution and for invading the pregnant woman's right of privacy. The Medical Board argues initially that this Court should abstain from making a decision on the merits of plaintiff's request for a declaratory judgment. Under the circumstances of this case, we conclude that abstention would not be warranted. See, e. g., Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Roe v. Wade, N.D. Tex., 1970, 314 F.Supp. 1217; Babbitz v. McCann, E.D.Wis., 1970, 310 F. Supp. 293. We therefore reach the merits of Dr. Rosen's argument. For reasons that follow, we conclude that the doctor's attack upon the constitutionality of section 37:1285(6) must fail.

## II.

The doctor urges that section 37:1285 (6) of the Louisiana Revised Statutes is unconstitutionally vague and indefinite because it fails to provide both fair warning to doctors and sufficient precision to guide the Medical Board, judges, and juries regarding the physical or mental conditions that justify an induced abortion under Louisiana law. This section provides for the removal of a physician's certification for "[p]rocuring, aiding, or abetting in procuring an abortion unless done for the relief of a woman whose life appears in peril after due consultation with another licensed physician." Rosen argues that the words "relief of a woman whose life appears in peril" do not provide meaningful guidance to the ordinary physician since the statute forbids abortions in terms "so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926); accord, Lanzetta v. State of New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939). He

also argues that uncertainty in the medical profession regarding the legality of certain medically indicated abortions is a constitutional defect in the statute as applied.

██ We have examined the challenged language and are persuaded that it is neither vague nor indefinite, but is instead reasonably comprehensible in its meaning, with its reach delineated in words of common understanding. See Babbitz v. McCann, E.D.Wis., 1970, 310 F.Supp. 293, 297–298; cf. Cameron v. Johnson, 390 U.S. 611, 616, 88 S.Ct. 1335, 1338, 20 L.Ed.2d 182 (1968). The clause "unless done for the relief of a woman whose life appears in peril" requires no guessing at its meaning. Rosen focuses upon the words "relief," "appears," and "life." These are widely used and well understood words, particularly when read in the context of section 37:1285(6). We conclude that the statute was intended to permit an induced abortion of an embryo or fetus only when the physician, after due consultation with another licensed physician, determines in good faith that continuation of the pregnancy will directly and proximately result in the death of the woman. In our opinion, the statute so read provides fair warning that Louisiana does not suffer the performance of all medically indicated abortions, however wise in the physician's estimation such an operation might be in a particular case, but rather allows the induced abortion of an embryo or fetus to be performed without sanction only when the life of the mother is directly endangered by the condition of pregnancy itself.

Four recent cases dealing with the constitutionality of abortion statutes have considered the sort of void-for-vagueness argument that Rosen makes against the Louisiana statute. In People v. Belous, 71 Cal.2d 996, 80 Cal.Rptr. 354, 458 P.2d 194 (1969), the California Supreme Court found that the words "necessary to preserve her life" in the California abortion statute then in effect were unconstitutionally vague. The

words "for the purpose of saving the life of the mother" in the Texas abortion statute were declared to be similarly defective by a three-judge district court in Roe v. Wade, N.D.Tex., 1970, 314 F. Supp. 1217. The District of Columbia abortion statute was held invalid in United States v. Vuitch, D.D.C., 1969, 305 F.Supp. 1032, on the ground that the word "health" in the phrase "as necessary for the preservation of the mother's life or health" was vague both in interpretation and practice. The words "necessary to save the life of the mother" in the Wisconsin abortion statute, on the other hand, were held not to be vague or indefinite as to their meaning in Babbitz v. McCann, E.D.Wis., 1970, 310 F.Supp. 293.

Like the *Babbitz* court, we do not share the view of the majority in *Belous* that language such as "necessary to preserve [or save] life" is so vague that one must guess at its meaning. *See generally* Comment, To Be or Not to Be: The Constitutional Question of the California Abortion Law, 118 U.Pa.L.Rev. 643, 644–649 (1970). Consequently, *Belous* is not persuasive on the issue of vagueness presented in this case. We also do not share the view of the court in *Roe* that a statute worded similarly to either the Texas or Louisiana acts is unconstitutionally vague because of the difficulty encountered in applying it to particular cases. As the Supreme Court has stated,

> "Wherever the law draws a line there will be cases very near each other on opposite sides. The precise course of the line may be uncertain, but no one can come near it without knowing that he does so, if he thinks, and if he does so, it is familiar to the criminal law to make him take the risk."

United States v. Wurzbach, 280 U.S. 396, 399, 50 S.Ct. 167, 169, 74 L.Ed. 508 (1930); *see* United States v. Petrillo, 332 U.S. 1, 7, 67 S.Ct. 1538, 1541–1542, 91 L.Ed. 1877 (1947). Moreover, the Louisiana statute makes express what is perhaps only implied in the Texas statute—that the abortion need only *appear* necessary, rather than actually be necessary to be permissible. *Vuitch* is readily distinguishable from the present case, since the court there concluded that the word "health," as distinct from the word "life," made the District of Columbia statute impermissibly vague. Thus the precise problem considered in *Vuitch* is not presented under the terms of the Louisiana statute.

In short, we conclude that although Rosen may have medical or even practical justification for his belief that the Louisiana statute too narrowly restricts the circumstances under which an abortion may be induced without sanction, he fails to convince this Court that the Louisiana Legislature was vague or indefinite in its choice of language.

## III.

The doctor next contends that the Louisiana statute, even if assumed not to be lacking in either clarity or precision, is void for "overbreadth," that is, section 37:1285(6) offends the constitutional principle that "a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." Zwickler v. Koota, 389 U.S. 241, 250, 88 S.Ct. 391, 396, 19 L.Ed.2d 444 (1967), *citing* NAACP v. Alabama ex rel. Flowers, 377 U.S. 288, 307, 84 S.Ct. 1302, 1314, 12 L.Ed.2d 325 (1964). Rosen argues that the statute unnecessarily and impermissibly invades his right as a physician to prescribe for his patients in accordance with his best professional knowledge. Specifically, he contends that the statute makes removal of his license a likelihood if, in the course of performing his duties as a physician, he assists a pregnant woman —who has had contraceptive failure or did not utilize contraceptives—in the exercise of what he asserts to be her fundamental, constitutionally protected right to choose whether to bear children. In substance, his argument is that: (1) a woman has a fundamental right, ex-

cept in very limited circumstances, to be free from unwanted governmental interferences in matters that, by their character and consequences, bear in a basic way upon her privacy, that is, she has a right to be let alone in matters involving her individual privacy; (2) included within her right to be let alone is her right to choose whether to bear children; (3) since the Louisiana statute infringes upon her right of choice in this matter and operates directly upon the physician's role in the effective exercise of that choice, the statute may be upheld by this Court only upon a showing by the State that such infringement is necessary to support a subordinating state interest which is compelling; and (4) the Louisiana statute sweeps far beyond any areas of compelling, subordinating state interests and is, therefore, invalid. Thus the doctor would have us first determine whether the right to choose to bear or not to bear, children is a fundamental one and then determine whether, if this is a fundamental right, the State has demonstrated a compelling need to infringe upon its exercise.

In our opinion, the issues in dispute here do not resolve themselves neatly into the questions posed by Dr. Rosen. The issues presented are much more complex, for the current controversy over the wisdom and constitutional validity of existing abortion laws centers upon a problem in which attitudes toward life, being, and sexual activity are in tumultuous disagreement. The specifics of the conflict in courts, legislative halls, and journals have often been the details of statutory language. The root disagreement, however, among men of intelligence and good will on all sides of the controversy has arisen over the evaluation of competing interests affected by abortion and the manner in which these interests are to be protected by law in a democratic society. *See generally* George, Current Abortion Laws: Proposals and Movements for Reform, in Abortion and the Law 1 (Smith ed. 1967); Ziff, Recent Abortion Law Reforms (Or Much Ado About Nothing),

60 J.Crim.L.C. & P.S. 3 (1969). Nature alone is responsible for the spontaneous abortion, and she needs no justification. But there remains for the determination by society, by whatever means it has chosen for the making of such momentous decisions, the conditions, if any, under which the embryo or fetus of the species homo sapiens may be destroyed within the womb.

The most recent attacks on abortion legislation, like Dr. Rosen's, have focused upon the interests of the pregnant woman as being of primary importance. The interests of the family unit, if any, of which the pregnant woman is a part and the needs of the community have also been advanced as reasons for the relaxation or abolition of laws prohibiting abortions. Little or no importance has been attached by these arguments to whatever interests may be possessed by the embryo or fetus the pregnant woman carries. In at least four instances, arguments such as these have been urged successfully. Roe v. Wade, N.D.Tex., 1970, 314 F.Supp. 1217; Babbitz v. McCann, E.D.Wis., 1970, 310 F.Supp. 293; People v. Belous, 71 Cal.2d 996, 80 Cal.Rptr. 354, 458 P.2d 194 (1969); State v. Munson (S.D.Cir.Ct., Pennington County, April 6, 1970). *See also* United States v. Vuitch, D.D.C., 1969, 305 F.Supp. 1032. In all these cases, the right asserted by plaintiffs to be free from unwanted governmental interference—freedom of choice in the matter of abortions—was equated by the court with the "fundamental right to choose whether to have children."

■ For the purposes of this case we assume, if we are not required to recognize, *e. g.*, Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Baird v. Eisenstadt, 1 Cir., 1970, 429 F.2d 1398, that as a general matter women possess under our Constitution a "fundamental right" to determine whether they shall bear children before they have become pregnant. A state may interfere with this right of choice only in special circumstances. *E.*

g., Buck v. Bell, 274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000 (1927). We deal in this case, however, not merely with whether a woman has a generalized right to choose whether to bear children, but instead with the more complicated question whether a pregnant woman has the right to cause the abortion of the embryo or fetus she carries in her womb. We do not find that an equation of the generalized right of the woman to determine whether she shall bear children with the asserted right to abort an embryo or fetus is compelled by fact or logic. Exercise of the right to an abortion on request is not essential to an effective exercise of the right not to bear a child, if a child for whatever reason is not wanted. Abstinence, rhythm, contraception, and sterilization are alternative means to this end. The first is, of course, infallible; the latter three are reliable to varying degrees approaching certainty. Before the "moment" of conception has occurred, *see generally* Ziff, Recent Abortion Law Reforms (Or Much Ado About Nothing), 60 J.Crim.L.C. & P.S. 3, 20–21 (1969), the choice whether or not to bear children is made in circumstances quite different from those in which such a choice might be made after conception. Apart, the sperm and the unfertilized egg will die; neither has the capacity to grow and develop independently as does the fertilized egg. During fertilization, sperm and egg pool their nucleii and chromosomes. Biologically, a living organism belonging to the species homo sapiens is created out of this organization. Genetically, the adult man was from such a beginning all that he essentially has become in every cell and human attribute. *See generally* Gray, Anatomy of the Human Body 21–60 (Goss 27th ed. 1959); 5 Lawyers' Medical Cyclopedia § 37.1 (1960). The basic distinction between a decision whether to bear children which is made before conception and one which is made after conception is that the first contemplates the creation of a new human organism, but the latter contemplates the destruction of such an organism already created. To some engaged in the controversy over abortion, this distinction is one without a difference. These men of intelligence and good will do not perceive the human organism in the early part of its life cycle as a human "being" or "person."[1] In their view, the granting to such an organism of the right to survive on a basis of equality with human beings generally should be delayed until a later stage in its development. To others, however, the "moment" of conception or some stage of development very close to this "moment" is the point at which distinctively human life begins.[2] In their view the difference be-

---

[1]. The views following are illustrative:
 "My feeling is that the fetus, particularly during its early intra-uterine life, is simply a group of specialized cells that do not differ materially from other cells. * * * And I feel that if it is going to be for the welfare of the adult individual, and for society in certain instances, we are justified in eliminating those cells. I do not think that I could be catalogued as a murderer. I just feel that under certain conditions the elimination of life of this type is justified. If one can justify shooting a burglar who enters your room, or going to war and shooting an enemy, one can certainly justify the elimination of some cells, which, from my point of view, have not yet become a human being, but simply have the potentialities of life. * * * "

Statement of Dr. Alan F. Guttmacher, in Symposium—Law, Morality, and Abortion, 22 Rutgers L.Rev. 415, 436 (1968);
 " * * * Physicians as a whole do not believe that a human being begins at conception. I know of no non-Catholic scientist who does. I know of no scientist at all, no scientist in any field of biological science, who would say that an acorn, the second that that acorn has been fertilized, is an oak. It is a potential oak; it is not an oak. And a fertilized ovum is not a human being. * * * "

Statement of Dr. Harold Rosen, in *id.* at 426.

[2]. For example, this is the official Roman Catholic position. E. g., Drinan, The Inviolability of the Right To Be Born, in Abortion and the Law 107 (Smith ed.

tween the decision not to conceive and the decision to abort is of fundamental, determinative importance. Thus the root problem in the controversy over abortion is the one of assigning value to embryonic and fetal life. *See* Giannella, The Difficult Quest for a Truly Humane Abortion Law, 13 Vill.L.Rev. 257 (1968).

In considering the problem of valuing prenatal life, we heed the words of Mr. Justice Holmes:

"It is a misfortune if a judge reads his conscious or unconscious sympathy with one side or the other prematurely into the law, and forgets that what seem to him to be first principles are believed by half his fellow men to be wrong * * *."

Holmes, Collected Legal Papers 295 (1920). When distinctively human life begins *is a matter about which reason*able, fair-minded men are in basic disagreement. Thus this case does not concern simply whether the pregnant woman has a fundamental right to be let alone in the control of her body processes, *cf.* Union Pac. Ry. Co. v. Botsford, 141 U.S. 250, 11 S.Ct. 1000, 35 L.Ed. 734 (1891) (submission to surgical examination), for it is unresolved whether, in the common understanding of the society in which she lives, choice of the destiny of the human organism developing within her is a matter directly affecting only her individual rights. We phrase the question for decision as follows: Can the State of Louisiana, consistent with the Fourteenth Amendment, assign to the human organism in its early prenatal development as embryo and fetus a right to be "born" [3] unless the condition of pregnancy directly and proximately threatens the mother's life? Our inquiry extends to (1) whether, and the extent to which, the State has assigned value to prenatal life, (2) whether the State is empowered to make such an assignment, and (3) whether the State's valuation is to be recognized for the purposes of this case.

We consider first the pattern of the Louisiana statutes pertaining to abortion. In Louisiana, "abortion" has been a crime since 1870. The 1870 statute, as amended, La.Acts, 1888, No. 24, provided:

"Whoever shall feloniously administer, or cause to be administered, any drug, potion, or any other thing, to any woman for the purpose of procuring a premature delivery, or whoever shall administer, or cause to be administered, to any woman pregnant with child, any drug, potion, or any other thing, for the purpose of procuring abortion or a premature delivery, or whoever by any means whatsoever shall feloniously procure abortion or premature delivery, shall be imprisoned at hard labor for not less than one nor more than ten years."

We have not been cited to or found any legislative history on this statute. As we read it, the statute made unlawful *the described acts if performed with* the specific intent to destroy a "child" before its natural birth, regardless of whether the woman was in fact pregnant; that is, attempts to perform the impossible were equated with and treated the same as actual performance. Reworded in 1942 and later amended, the statute reads today:

"Abortion is the performance of any of the following acts, with the intent of procuring premature delivery of the embryo or fetus;

(1) Administration of any drug, potion, or any other substance to a female; or

(2) Use of any instrument or any other means whatsoever on a female. "Whoever commits the crime of abortion shall be imprisoned at hard labor for not less than one nor more than ten years."

---

1967); Statement of Thomas J. O'Donnell, S. J., in Symposium—Law, Morality, and Abortion, 22 Rutgers L.Rev. 415, 431–432 (1968).

3. As used here, the term "born" refers to delivery from the womb after the developing human organism is capable of sustaining life outside the womb. *See* La. Rev.Stat.Ann. § 40:142.

La.Rev.Stat.Ann. § 14:87 (Supp.1970). In substance, the Louisiana criminal law on abortion has been unchanged for one hundred years.[4]

■ In Louisiana, conviction of a crime such as the crime of "abortion" proscribed by section 14:87, and procuring, aiding or abetting in procuring an "abortion" unless done to save the life of the mother are separate grounds upon which the Medical Board may properly refuse to issue, suspend, or institute court proceedings to revoke a certificate to practice medicine to which a physician would otherwise be entitled. La.Acts, 1914, No. 56, § 16, as amended, La.Acts, 1918, No. 54, § 10, codified, La.Rev.Stat. Ann. § 37:1285(1), (6). *See also* La. Rev.Stat.Ann. § 1271 (qualifications of applicants for certificates). Since sections 14:87 and 37:1285(6) deal with the same subject matter, we construe them together. So doing, we conclude that Louisiana prohibits the performance of certain acts if made with the intent to destroy an "embryo" or "fetus" before natural "birth," unless (1) the actor is a physician and (2) the acts are performed for the relief of a woman whose life appears in peril. As used in section 14:87, the terms "embryo" and "fetus" refer to separate stages in prenatal development. State v. Dore, 227 La. 282, 79 So.2d 309 (1955). In medical terminology, "embryo" refers to the developing human organism from one week after conception to approximately the end of the second month. "Fetus" refers to the organism from that point until termination of prenatal development. Dor-

land, Illustrated Medical Dictionary 439, 500 (23d ed. 1957).[5] From conception until the twentieth week of development, expulsion of the embryo or fetus from the womb is not considered by the State to be a "birth." La.Rev.Stat.Ann. § 40:-142(5).

■■ From a reading of the Louisiana statutes, it is plain that the State has attempted to provide embryonic and fetal organisms with protection against destruction by other than natural causes in at least the second and succeeding weeks of prenatal development, without regard to whether the organism is capable of sustaining life outside the womb. This protection is qualified. The embryo or fetus may legally be destroyed by a physician if the condition of pregnancy, after due consultation with another licensed physician, appears directly and proximately to threaten the woman's life. Also, section 14:87, as construed, does not make the woman criminally responsible for the destruction of the embryo or fetus she once carried. *E. g.*, Simmons v. Victory Industrial Life Ins. Co. of Louisiana, 18 La.App. 660, 139 So. 68 (1932). With these qualifications, a principal effect of the Louisiana statutes has been a conferment upon the embryonic or fetal organism of a right to survive to a natural termination of prenatal development. Necessarily implicit in this conferment is a valuation of embryonic and fetal life in relation to the life of the infant, the child, and the adult. Regardless of whatever interests the pregnant woman or others may have in ending the life of the embryo or

---

4. Section 14:87 was amended in 1964 to provide, as did the 1870 statute, that commission of the crime of abortion does not depend upon whether the woman is actually pregnant, so long as the requisite unlawful intent is present. From 1942 until 1964, an attempt to perform an abortion on a woman who was not pregnant apparently was punishable as an "attempt," rather than as a crime of abortion.

5. Although Louisiana law is clear to the effect that "embryo" and "fetus" refer to separate stages of prenatal development,

there is no Louisiana law on the question whether "embryo," as used in section 14:87, refers to the "zygote" as well as to the "embryo," as used in medical terminology. If the statute uses "embryo" in its technical medical sense, the induced expulsion of the "zygote" from the womb in the first week of development would not be an "abortion" under section 14:87, because the section deals with the "embryo" and the "fetus." We note this question without comment since its resolution is unnecessary to the disposition of this case.

fetus she carries, application of the Louisiana statutes, subject to the above qualifications, results in the subordination of such interests to the policy of the State that prenatal life must be afforded the opportunity to develop toward a natural birth.

■ In medical terminology, "abortion" generally refers to the premature expulsion from the womb of the embryo or of the nonviable fetus. Dorland, Illustrated Medical Dictionary 4 (23d ed. 1957). As indicated, the Louisiana statutes make no distinction based upon viability in defining "abortion," that is, upon whether the fetal organism has developed to the stage in which it can sustain life outside the womb or, in the terminology adopted by the State, be "born." See La.Rev.Stat.Ann. § 40:142(5). Dr. Rosen argues that Louisiana has not expressed a policy of preferring the interests of an embryo or nonviable fetus as a "human being" over those of the pregnant woman, family unit, or community. To the contrary, he claims, Louisiana has expressed no interest in the embryo or nonviable fetus. Also, he urges that section 37:1285(6) is unconstitutional because the only "legitimate" purpose for which it, like the 1870 criminal statute and its successors, could have been enacted—protection of the lives and health of pregnant women—is no longer served by its application. Not persuaded by these arguments, we conclude that Louisiana has sufficiently manifested its interest in protecting the embryo or nonviable fetus and that section 37:1285 (6) cannot be voided essentially on the ground that it is no longer wise legislation.

The inevitable effect of the Louisiana statutes in question is to accord embryonic and fetal human life qualified protection against premeditated destruction by persons other than the mother. As we have said, implicit in this affording of protection is the assignment of value to the embryonic or fetal organism as a form of human life. "Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive." [6] Berman v. Parker, 348 U.S. 26, 32, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954). In our opinion, the State of Louisiana values embryonic or fetal human organisms to the extent that such organisms—forms of human life—are entitled to enjoy in at least some basic respects the right to survive on a basis of equality with human beings generally.

As we have indicated, the protection afforded by Louisiana to the embryo or fetus is not coextensive with the protection afforded to the infant, the child,

---

6. The abortion statutes are not the only laws in which Louisiana has manifested its concern with the problem of valuing prenatal life. In Louisiana, "Children in the mother's womb are considered, in whatever relates to themselves, as if they were already born; thus the inheritances which devolve to them before their birth, and which may belong to them, are kept for them, and curators are assigned to take care of their estates for their benefit." La.Civ.Code Ann. art. 29. In the matter of successions, for example, the "child in its mother's womb is considered as born for all purposes of its own interest; it takes all successions opened in its favor since its conception, provided it be capable of succeeding at the moment of its birth." La.Civ.Code Ann. art. 954. It is true, as Dr. Rosen points out, that the right to inherit vests only in children born alive, regardless of the mode of birth and the length of life after birth, La.Civ. Code Ann. arts. 956, 957, and "Children born dead are considered as if they had never been born or conceived." La.Civ. Code Ann. art. 28. From this the doctor argues that the abortion of an embryo or nonviable fetus would do no violence to the existing Louisiana law of successions. See Comment, Abortion and the Law: A Proposal for Reform in Louisiana, 43 Tul.L.Rev. 834, 850–851 (1969). Whether this argument is correct or not is beside the point. Read together, the abortion and succession statutes manifest a coherent policy: The "child in its mother's womb" (embryo or fetus) is afforded certain rights by the State, the enjoyment of which vests upon live birth; the abortion statutes afford the embryo or fetus a qualified opportunity to be born alive in order to enjoy rights such as that of inheritance.

and the adult. Historically and today, the State has demonstrated a greater concern for life after birth than for life before birth. For example, although Louisiana early adopted the common law as to the definition of crimes, La.Acts, 1805, No. 50, § 33, and abortions were not permitted at common law after fetal "quickening," *see, e. g.*, Stern, Abortion: Reform and the Law, 59 J.Crim.L. C. & P.S. 84, 85 (1968),[7] the principle that all crimes in Louisiana are statutory, *e. g.*, State v. Williams, 7 Rob. 252 (La.1844), meant that abortion was not a crime in this State until the 1870 statute was enacted. In terms of punishment and criminal responsibility also, the State has not equated the destruction of an embryo or fetus with the destruction of an infant, a child, or an adult. For example, the pregnant woman who causes the abortion of the "child" in her womb is not made criminally responsible, and those to whom she turns for an abortion may be imprisoned for no more than ten years for the offense. The mother who causes the death of her infant child, on the other hand, may be convicted of murder, manslaughter, or negligent homicide, as the case may be, with death as the ultimate penalty. La. Rev.Stat.Ann. §§ 14:30–32. These facts suggest, for example, that Louisiana does not equate the equality of the offense of "murder," La.Rev.Stat.Ann. § 14:30, with the quality of an act of abortion. In no meaningful way, however, do they rebut the Medical Board's contention that, for the past century, the State in its abortion laws has manifested a policy of protecting human life in its embryonic and fetal forms.[8]

Dr. Rosen argues that the purpose of the Louisiana abortion statutes—other than to compel adherence to specified moral norms [9]—is to protect the lives and health of women who believe themselves to be pregnant rather than to protect the embryo or fetus from destruction. Notwithstanding that these laws, when obeyed, do protect the embryo or fetus, it is suggested that, in light of the pattern of the Louisiana statutes and the history of abortion and the law generally, the Louisiana laws are, at best, health measures that no longer promote good health.[10]

We decline to void section 37:1285(6) essentially on the ground that advances in medical knowledge and surgical techniques have made unwise

---

7. *See also* 3 Coke, Third Inst. 50 (1797); 1 Blackstone, Commentaries Comm. 1, 129–130 (4th ed. 1771); Perkins, Criminal Law 101 (1957).

8. In Louisiana, "homicide" is the killing of a "human being," and criminal homicide is either murder, manslaughter, or negligent homicide. La.Rev.Stat.Ann. § 14:29. Since the destruction of an embryo or fetus is not a homicide under Louisiana law, it has been argued that the State does not consider embryonic and fetal life forms as "human beings." Though destruction of an embryo or fetus under Louisiana law is not considered a homicide so that the perpetrator of its destruction is punishable as a "murderer," it does not follow from the principle that "murder" and "abortion" are distinct crimes under state law that the Louisiana Legislature did not consider embryo and fetus as forms of human life. We may not ascribe to the legislature ignorance of biological realities, \ nor should we, at the same time, require its express manifestation that it was aware of these realities.

9. The enactment of abortion legislation in the last century has been attributed to the influences of "comstockery." 5 Harv. Civ.Rights-Civ.Lib.L.Rev. 133, 144 (1970). Anthony Comstock, who inspired the use of the opprobrious word "comstockery," was, of course, a man to whom obscenity was "poison to soul and body, and anything remotely touching upon sex was * * * obscene." Broun & Leech, Anthony Comstock 265–266 (1927), *in* Poe v. Ullman, 367 U.S. 497, 520 n. 10, 81 S.Ct. 1752, 1764–1765 n. 10, 6 L.Ed. 2d 989 (1961) (Brennan, J., concurring).

10. *See, e. g.*, Tietze, Mortality With Contraception and Induced Abortion, 45 Studies in Family Planning 6 (1969); Tietze, Abortion Laws and Abortion Practices in Europe, Excerpta Medica International Congress Series No. 207 (1969); People v. Belous, 71 Cal.2d 954, 965, 80 Cal.Rptr. 354, 361, 458 P.2d 194, 201 (1969).

# 1228

legislation which the State of Louisiana had the power to enact, and we do not believe that the constitutional validity of statutes turns upon whether legislators make speeches or otherwise manifest their intent that the inevitable effect of statutes, viewed on their face alone, was indeed meant to occur. It is a familiar principle of constitutional law that the federal courts will not strike down an otherwise constitutional statute on the basis of an alleged wrongful legislative motive. E. g., United States v. O'Brien, 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672 (1968); McCray v. United States, 195 U.S. 27, 56, 24 S.Ct. 769, 776, 49 L.Ed. 78 (1904). Similarly, the federal courts will not void legislation which a State had the power to enact on more than one ground because the alleged dominant motive behind the statute is no longer served by its application. In this case, we hold that the State of Louisiana was empowered to place a value upon prenatal human life and that the valuation manifested by the Louisiana abortion statutes may not be struck down by this Court.

At issue here is whether the Louisiana abortion statutes, in assigning a value to prenatal life relative to the interests of the pregnant woman, her family unit, if any, and the community, have invaded a realm of private morality which is not the State's business. Compare Committee on Homosexual Offenses & Prostitution (Wolfenden Committee), Report, CMD. No. 247, ¶ 62 (1957).[11] The crime of abortion in Louisiana is classified together with carnal knowledge of, or indecent behavior with, juveniles, prostitution, and the "crime against nature" as "offenses affecting sexual morality."[12] To many in Louisiana, as in other states, a woman who voluntarily causes an abortion of the embryo or fetus she carries "is guilty of a detestible and revolting offense against the laws of nature, which is universally condemned." Payne v. Louisiana Industrial Life Ins. Co., 33 So.2d 444, 445 (La.Ct.App.1948). See also, e. g., Mills v. Commonwealth, 13 Pa. 631, 632 (1850). To others like Dr. Rosen, on the other hand, the failure to limit procreation by abortion is itself unconscionable and immoral if, for example, offspring are destined to be physically or mentally deformed in some fundamental way, to be undernourished, maleducated- misfits or rebels against society, or to be unwanted or not cared for because of the economic, physical, and psychological dislocations their births and rearing cause in their parents' lives. We must ask whether abortion, a problem in which attitudes toward life, being, and sexual activity are in such turmoil, is the business of government and the law.

■ The review of state legislation by the federal courts, whether such legislation is considered to be in the exercise of the State's police power or in provision for the health, safety, morals, or welfare of its people, concerns the "powers of government inherent in every sovereignty." The License Cases, 46 U.S. (5 How.) 504, 583, 12 L.Ed. 256, 291 (1847); Poe v. Ullman, 367 U.S. 497, 539, 81 S.Ct. 1752, 1775, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting). The definition of a State's police power is "essentially the product of legislative determinations addressed to the purposes of government, purposes neither abstractly nor historically capable of complete definition." Berman v. Parker, 348 U.S. 26, 32, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954). The term "police power" connotes the "time-tested conceptual limit of public encroachment upon private interests." Goldblatt v. Town of Hempstead, N.Y., 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962). The federal courts may interfere with

---

11. See also Devlin, The Enforcement of Morals 1–25 (1965); Sutherland, Constitutionalism in America 527–536 (1965); Henkin, Morals and the Constitution: The Sin of Obscenity, 63 Colum.L.Rev. 391 (1963); Schwartz, Morals Offenses and the Model Penal Code, 63 Colum.L.Rev. 669 (1963).

12. La.Rev.Stat.Ann. §§ 14:80–89.

the exercise of this plenary power of government by the States only to the extent that the Constitution so requires. Barron, for Use of Tiernan v. Mayor and City Council of Baltimore, 32 U.S. (7 Pet.) 243, 8 L.Ed. 672 (1833).

The abortion problem concerns the circumstances, if any, that justify the termination of the process of procreation after human life, genetically and biologically, has been conceived. This problem involves the condition of pregnancy and its likely consequence, the first entrance of a new player, "mewling and puking," onto the world stage. Shakespeare, As You Like It, Act ii, sc. 7, l. 139. In specific cases, the condition of pregnancy, if not terminated, may affect the essential welfare of the woman involved; it may cause her to die before her time, to suffer a serious impairment of her health, to waste her life, to be deeply unhappy, or to be happy in a way that society considers to be less than human.[13] Similarly affected may be the essential welfare of the unwanted player once born and the family into which it is born. If the healthy society is viewed as one that not only maintains itself as a going concern, but also, through its free and democratic character, moves in the direction of giving greater scope and expression to those wholesome attributes that set man above the lower species, it may be seen that the abortion problem, if not wisely handled, may in the end impair the good health of the society. But federal judges are not inevitably the source of the wise solution. Under our Constitution, federal judges play a limited role in reviewing the legislation of Congress and the States. We believe that if the passage of a law or a failure to effect its repeal "has ruined a state, there was a general cause at work that made the state ready to perish by a single * * * law." Holmes,

Collected Legal Papers 295 (1920). Thus we view the Louisiana abortion laws.

At least with respect to abortion, as medically defined, in the early, nonviable stages of development, proponents of the abolition or "liberalization" of abortion laws have in the main taken as their premise that distinctively human life, that is, valued life, does not commence at conception or at some point near it, but instead at some later stage of prenatal development, such as the point of viability, or at birth itself. Opponents of abolition or "liberalization" have argued from quite different premises. On balance, when "distinctively human" life begins is a matter of contest not so much between those persons and groups who see an embryo or fetus as a human being and those who do not, although this too is involved, but rather is a matter of contest between conflicting views regarding the importance of mere existence in relation to a high quality or excellence of existence.[14] In other words, proponents of abolition or "liberalization" have tended to stress the quality of life after birth rather than the mere existence of life, while their opponents have argued for the transcendence of any life, born or unborn, over the health or happiness of an older or more powerful life. Thus abortion, involving as it does the destruction of, biologically and genetically speaking, a form of human life, raises a basic issue of public interest concerning the value of the human embryo or fetus.

In Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the Supreme Court struck down a state statute forbidding the use of contraceptives because the law was found to operate unjustifiably upon one aspect of the intimate relation of husband and wife. From this is largely drawn by

13. The concepts of "essential welfare" and of the "healthy society" mentioned here are taken from Banfield, The Unheavenly City, 10–11 (1968).

14. *See generally* Drinan, The Morality of Abortion Laws, in Symposium—Abortion Law Reform, 14 Catholic Lawyer 180 (1968); Jakobovits, Jewish Views on Abortion, in Abortion and the Law 142 (Smith ed. 1967).

Dr. Rosen the argument that a fundamental right of women to choose whether to bear children, after as well as before conception has occurred, must be recognized. In *Griswold,* however, the Court was not required to sit as a super-legislature or rove at large in light of personal and private notions to conclude that choice in the matter of contraceptives was part of the rights associated with home, family, and marriage, which rights were supported by precedent, history, and common understanding.[15] The decision thus operates within a narrow sphere, *see* Kauper, Penumbras, Peripheries, Emanations, Things Fundamental and Things Forgotten: The Griswold Case, 64 Mich.L.Rev. 235 (1965); its principles, while tending to expand themselves to the limit of their logic, Cardozo, The Nature of the Judicial Process 51 (1921), must be contained by the historical frame of reference of their purpose. Walz v. Tax Commission of City of New York, 397 U.S. 664, 678–679, 90 S.Ct. 1409, 1416, 25 L.Ed.2d 697 (1970). In our opinion, whether the problem of abortion is a private one of personal or family morality requires first a resolution of the issue of public concern, that is, whether embryonic and fetal organisms should be afforded an opportunity to survive in at least some basic respects on a basis of equality with human beings generally.

 Dr. Rosen has strenuously urged before this Court the social undesirability of the Louisiana abortion laws. We may not, however, while professing to act in the service of humane ends, confound private notions with constitutional imperatives. Even where the social undesirability of a law is not disputed, and this is by no means such a case,[16] invalidation of that law by a court debilitates popular democratic government. American Fed. of Labor v. American Sash & Door Co., 335 U.S. 538, 553, 69 S.Ct. 258, 265, 93 L.Ed. 222 (1949) (Frankfurter, J., concurring). We do not share the views of the Courts in Babbitz v. McCann, E.D.Wis., 1970, 310 F.Supp. 293, and Roe v. Wade, N.D.Tex., 1970, 314 F.Supp. 1217, regarding the criteria to be used in testing the constitutionality of abortion legislation. In *Babbitz,* for example, the Court, holding that the State of Wisconsin had not

---

15. For example, the Court had previously held that the liberty entitled to protection under the Fourteenth Amendment includes the right "to marry, establish a home and bring up children," Meyer v. State of Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), and the "liberty of parents and guardians to direct the upbringing and education of children under their control." Pierce v. Society of the Sisters of the Holy Names, etc., 268 U.S. 510, 534–535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925). In Skinner v. State of Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), the Court struck down an Oklahoma statute providing for the compulsory sterilization of "habitual criminals" on the ground that the statute invidiously discriminated between persons who had committed intrinsically the same quality of offense by sterilizing the one and not the other. To emphasize its view that "strict scrutiny of the classification which a State makes in a sterilization law is essential," the Court noted that it dealt "with legislation which involves one of the basic civil rights of man. Marriage and procreation are fundamental to the very existence and survival of the race. The power to sterilize, if exercised, may have subtle, far-reaching and devastating effects. * * *" 316 U.S. at 541, 62 S.Ct. at 1113. Finally, in Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944), the Court stated:

"It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. Pierce v. Society of Sisters, supra. And it is in recognition of this that these decisions have respected the private realm of family life which the state cannot enter."

16. Considerations of geopolitics, economy, tinkering with natural ecology, genocide, and sociology have been advanced in arguments against the broadening of circumstances under which abortion is permissible. *See generally, e. g.,* Callahan, Abortion: Law, Choice and Morality (1970).

shown a compelling public necessity for invading a woman's "right to refuse to carry an embryo during the early months of pregnancy," concluded: " * * * [T]he mother's interests are superior to that of an unquickened embryo whether the embryo is mere protoplasm, as the plaintiff contends, or a human being, as the Wisconsin statute declares." 310 F.Supp. at 301. This conclusion, we believe, is not mandated by the Constitution.

■■■■■ A reading of current and historical writings on the abortion problem convinces us that *Babbitz* and *Roe* were decided upon theories of life and being which a large part of this country does not entertain.[17] "[T]he word 'liberty,' in the 14th Amendment, is perverted when it is held to prevent the

natural outcome of a dominant opinion, unless it can be said that a rational and fair man necessarily would admit that the statute proposed would infringe fundamental principles as they have been understood by the traditions of our people and our law." Lochner v. New York, 198 U.S. 45, 76, 25 S.Ct. 539, 547, 49 L. Ed. 937 (1905) (Holmes, J., dissenting). We are not persuaded that the Louisiana abortion laws infringe any fundamental principle as understood by the traditions of our people. As an ethical, moral, or religious matter, a woman's refusal to carry an embryo or fetus to term, both historically and today, has been condemned as wrong by a substantial, if not a dominant, body of opinion, except in very limited circumstances.[18] Common science of our people that it must be

---

17. The attitudes of a society are reflected, at least to some extent, by the statutes it enacts. In 1965, the abortion legislation of the several States might have been roughly classified as those that, in form, prohibited all abortions and those that permitted abortions under carefully limited circumstances. George, Abortion Laws: Proposals and Movements for Reform, in Abortion and the Law 1 (Smith ed. 1967). A review of state legislation today suggests that attitudes toward abortion are in a state of transition, and discussion of the abortion problem is certainly no longer taboo. *See* Clark, Religion, Morality, and Abortion: A Constitutional Appraisal, 2 Loyola U.L.A.L.Rev. 1 (1969).

18. Views from the ranks of organized religion reflect that abortion has been considered morally wrong, except in very limited circumstances. The circumstances that justify abortion vary from religion to religion and denomination to denomination, and it appears that, on balance, attitudes toward abortion are in a state of transition. The official Roman Catholic position is well known. One Roman Catholic commentator has stated that " * * * Catholic moral theology and philosophy have retained, more than the teaching of most other religious denominations, the traditional, and until recently, unchallenged view that abortion is the taking of the life of an unborn but, neverthless, a real human being." Drinan, The Inviolability of the Right To Be Born, in Abortion and the Law 107–108 (Smith ed. 1967). The Lutheran Church

apparently opposes abortion for any reason, while the Presbyterian Church, at least until recently, has favored abortion only to save the mother's life. Reliance is placed upon the individual conscience by the Unitarian and Episcopal Churches, and the Southern Baptist Church has not taken an official position. Rosen, Abortion in America 154–161 (2d ed. 1967). The Orthodox Jewish position will permit abortion if necessary to save the mother's life, and even a remote risk of life invokes "all the life-saving concessions of Jewish law, provided the fear of such a risk is genuine and confirmed by the most competent medical opinions." Jakobovits, Jewish Views on Abortion, in Abortion and the Law 124, 143 (Smith ed. 1967). For example, the "Jewish concern for the mother is so great that a gravid woman sentenced to death must not be subjected to the ordeal of suspense to await the delivery of her child." *Id.* at 142–143. In contrast, the common law has long known the writ *de ventre inspiciendo* authorizing matrons or "discreet women" to inspect the body of a woman to determine if she is pregnant. This writ was issued, for example, to determine before a hanging whether a convicted female was pregnant. If a child was found to be "alive in the womb," that is, "quick," execution was stayed generally until the child was born or by the course of nature it proved that the woman was not pregnant at all. 4 Blackstone, Commentaries Comm. 1, 395 (4th ed. 1771). Conservative and Reform Jews apparently regard abortion far

convictions and attitudes are subject to change, of course, and the valuation of embryonic and fetal life urged by Dr. Rosen may prove ultimately to be supported by common understanding, but we do not find that his valuation is so supported today.

 Section 37:1285(6) of the Louisiana Revised Statutes, we conclude, does not offend the due-process clause of the Fourteenth Amendment. We do not recognize the asserted right of a woman to choose to destroy the embryo or fetus she carries as being so rooted in the traditions and collective conscience of our people that it must be ranked as "fundamental." The valuation of embryonic and fetal organisms made by the State of Louisiana is sup-

more liberally than do Orthodox Jews. Hall, Commentary, in Abortion and the Law 224, 232 (Smith ed. 1967).

The mere assertion, of course, that the action of the State finds justification in the controversial realm of morals "cannot justify alone any and every restriction it imposes. See Alberts v. State of California, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498. * * *

"Yet the very inclusion of the category of morality among state concerns indicates that society is not limited in its objects only to the physical well-being of the community, but has traditionally concerned itself with the moral soundness of its people as well. Indeed to attempt a line between public behavior and that which is purely consensual or solitary would be to withdraw from community concern a range of subjects with which every society in civilized times has found it necessary to deal. The laws regarding marriage which provide both when the sexual powers may be used and the legal and societal context in which children are born and brought up, as well as the laws forbidding adultery, fornication and homosexual practices which express the negative of the proposition, confining sexuality to lawful marriage, form a pattern so deeply pressed into the substance of our social life that any Constitutional doctrine in this area must build upon that basis. * * *"

Poe v. Ullman, 367 U.S. 497, 545–546, 81 S.Ct. 1752, 1778, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting); cf. Walz v. Tax Commission of City of New York, 397 U.S. 664, 677–678, 90 S.Ct. 1409, 1415–1416, 25 L.Ed.2d 697 (1970).

ported by scientific fact. Because we further find that section 37:1285(6) is necessary to the accomplishment of a permissible state policy, we must decline plaintiff's invitation to void this law.[19]

Judgment will be entered in favor of defendant, dismissing plaintiff's suit.

Before AINSWORTH, Circuit Judge, and BOYLE and CASSIBRY, District Judges.

CASSIBRY, District Judge (dissenting): *

" * * * One of the basic values of [the right to] privacy is birth control, as evidenced by the Griswold decision. Griswold's act was to prevent forma-

19. As Mr. Justice Clark has said,
"It is for the legislature to determine the proper balance, i. e., that point between prevention of conception and viability of fetus which would give the State the compelling subordinating interest so that it may regulate or prohibit abortion without violating the individual's constitutionally protected rights."

Clark, Religion, Morality, and Abortion: A Constitutional Appraisal, 2 Loyola U. L.A.L.Rev. 1, 11 (1969). Whether the State of Louisiana, as defendant suggests, has a constitutional duty under the Fourteenth Amendment to protect embryonic or fetal life from destruction by induced abortion is a question we do not consider in the disposition of this case, and we intimate no opinion on its merits.

We have carefully considered Dr. Rosen's contention that section 37:1285(6) denies to him, as well as certain classes of pregnant women, and poor pregnant women generally, equal protection of the laws, which is guaranteed by the Fourteenth Amendment. In particular, we have considered the argument that an affluent woman, whether by legal or illegal means, has a better opportunity than a poor one to obtain an abortion at little risk to her life or health. We are, however, unwilling to equate the types of inequality suggested by Dr. Rosen with a denial of a protected right under the Fourteenth Amendment. Therefore, we reject plaintiff's equal protection argument.

* I concur in those portions of the Court's opinion which hold that we should not abstain and that the abortion laws are not unconstitutionally vague.

tion of the fetus. This, the court found, was constitutionally protected. If an individual may prevent conception, why can he not nullify that conception when prevention has failed?" Mr. Justice Clark, Religion, Morality, and Abortion: A Constitutional Appraisal, 2 Loyola Law Review of L. A. 1, 8 (1969)

Because, answer the majority of this Court, a "human life" comes into existence at conception, and the State's interest in protecting that life overrides the fundamental human rights of the mother to the control of her own body and to choose whether to bear a child. But in my view the history and operation of the Louisiana abortion law belie the majority's construction of a purpose to protect human life. If the purpose is to protect life, this law is "the very mirror image"[1] of what one would suppose such a law to be. The law rather seems to be an effort to enforce certain views of private morality against those not sharing those views, see note 25, *infra*. Far from protecting human life it tends in practice to destroy it. And not the least of the evils of this law is that it operates as an invidious discrimination against the poor.

## I

### Fundamental Nature of the Mother's Rights

In Part I of this opinion I pass over the interests of the fetus, and, for purposes of analysis, focus solely on the impact of the abortion law on the *mother*. In this Part I set up an artificial assumption, that the fetus is no more than a collection of living cells, a part of the mother's own body that, when separated, dies. In the next two Parts of the opinion I consider the exact nature of the State's interest in the fetus.

In a series of cases, culminating in Griswold v. Connecticut, 381 U.S. 479,

85 S.Ct. 1678, 14 L.Ed.2d 510 (1964), the Supreme Court of the United States has established an area of fundamental human liberty in matters relating to marriage, the family and children. This development is summarized by Mr. Justice White in his concurring opinion in *Griswold* (at 502, 85 S.Ct. at 1691): "It would be unduly repetitious, and belaboring the obvious, to expand on the impact of this [Connecticut anticontraceptive law] on the liberty guaranteed by the Fourteenth Amendment against arbitrary and capricious denials or on the nature of this liberty. Suffice it to say that this is not the first time this Court has had occasion to articulate that the liberty entitled to protection under the Fourteenth Amendment includes the right 'to marry, establish a home and bring up children,' Meyer v. State of Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 and 'the liberty * * * to direct the upbringing and education of children,' Pierce v. Society of Sisters, 268 U.S. 510, 534–535, 45 S. Ct. 571, 573, 69 L.Ed. 1070, and that these are among 'the basic civil liberties of man.' Skinner v. State of Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 [compulsory sterilization of habitual criminals]. These decisions affirm *that there is a 'realm of family life which the State cannot enter without substantial justification.* Prince v. Com. of Massachusetts [321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645]' * * *." (emphasis added).

*Griswold* reaffirmed and extended these principles. In the most sweeping terms the Court struck down a criminal law which infringed on the rights of Connecticut couples to practice contraception. Although Mr. Justice Douglas's opinion for the Court focused upon the right of "marital privacy," there is no question that the right to prevent unwanted birth of children was involved as well.[2] Mr. Justice Goldberg (joined

---

1. Baird v. Eisensdtadt (1 Cir. 1970), 429 F.2d 1398.

2. The United States Court of Appeals for the First Circuit has interpreted *Griswold* as establishing a fundamental right of birth control. *Baird*, note 1, *supra*. In

by Mr. Chief Justice Warren and Mr. Justice Brennan) spoke of "The marital *right to bear children and raise a family*," 381 U.S. at 497, 85 S.Ct. at 1688 and found that the Constitution protected "against * * * *totalitarian limitation of family size*, which is at complete variance with our constitutional concepts." *Id.* (emphasis added); and Mr. Justice White stressed the fact that "The Connecticut anti-contraceptive statute * * * forbids all married persons to use birth control devices *regardless of whether their use is dictated by considerations of family planning, health, or even life itself* * * * [and that the] clear effect of these statutes, as enforced, is to deny disadvantaged citizens * * access to medical assistance and up-to-date information in respect to proper methods of *birth control*." 381 U.S. at 503, 85 S.Ct. at 1691, 1692 (emphasis added)

It is true that the *Griswold* Court did not pass upon the precise question presented here: *Griswold* involved contraception; this case involves abortion. Nevertheless *Griswold* is critically relevant to the present case. For unlike a procedural holding which may be narrowly confined to its particular facts, the *Griswold* decision rested upon the broadest and most sweeping principles of substantive constitutional law. The various opinions may have disagreed as to the methodology by which, or the particular Amendments from which, the right of family privacy is derived. But on one point the seven majority Jus-

tices agreed: The "right," be it derived from the First or Fourth, the Ninth or Fourteenth, Amendments, or all of them, was a right "so rooted in the traditions and conscience of our people as to be ranked as fundamental." 381 U.S. at 487, 85 S.Ct. at 1683.

The language of the *Griswold* opinions is strong and unequivocal. Mr. Justice Harlan found that "For reasons stated at length in my dissenting opinion in Poe v. Ullman * * * [the Connecticut] enactment violates basic values 'implicit in the concept of ordered liberty,' Palko v. Connecticut [citation omitted]." 381 U.S. at 500, 85 S.Ct. at 1690. In Mr. Justice White's view "[the] decisions affirm that there is 'a realm of family life which the State cannot enter' without substantial justification [citation omitted]." And Mr. Justice Goldberg, Mr. Chief Justice Warren, and Mr. Justice Brennan considered that "the integrity of that [family] life is fundamental," Griswold v. Connecticut, *supra*, 381 U.S. at 495, 85 S.Ct. at 1687, that it is one of "the requirements of a free society," *Id.* at 493, 85 S.Ct. at 1687 (quoting from Poe v. Ullman, dissenting opinion of Mr. Justice Douglas), and that it "is of such a character that it cannot be denied without violating those 'fundamental principles of liberty and justice which lie at the base of all our civil and political institutions' * * *." *Id.* at 493, 85 S.Ct. at 1686.

For me, then, the *Griswold* case contains a broad command. It says, to this and other courts: You must protect the

---

a case involving the application of the Massachusetts anti-contraceptive law to single persons the Court said:

> "[W]e consider that [the law] conflicts with fundamental human rights. In the absence of demonstrated harm, we hold that it is beyond the competency of the state. See the various opinions in Griswold v. Connecticut, *ante*, particularly those of Mr. Justice Harlan and Mr. Justice White, concurring. See also Richards v. Thurston, 1 Cir., 4/28/70, 424 F.2d 1281." (Aldrich, C. J.).

Several other courts have held that *Griswold's* right of privacy extends to single persons, and, in the "absence of

demonstrated harm," to abortion as well as contraception: People v. Belous, 71 Cal.2d 996, 80 Cal.Rptr. 354, 458 P.2d 194 (1969); Babbitz v. McCann, 310 F.Supp. 293 (E.D.Wis., 1970); see particularly State v. Munson (Cir.Ct., Pennington County, S. Dakota, April 6, 1970); Roe v. Wade, 314 F.Supp. 1217 (N.D.Texas, Civ. Nos. 3–3690–B & 3–3691–C, June 17, 1970). See also United States v. Vuitch, 305 F.Supp. 1032 (D.D.C., 1969).

I agree with these courts that *Griswold* establishes a right of birth control, and I see no reason to limit the right to married persons (see note 25, *supra*).

privacy and intimacy of family life, for such relationships lie at the very core of a free society. And laying aside for the moment the interest of the State, I have no doubt that the Louisiana abortion statute falls within this sensitive area.

Indeed in some ways the right to have an abortion is even more compelling than the rights involved in *Griswold*. Contraception involves the first line of defense against an unwanted birth; abortion the last. At the point contraceptives are used birth is only a possibility; there are a number of forces tending to prevent it apart from contraception. When a mother seeks an abortion, however, she has already conceived. Unless a spontaneous abortion or miscarriage occurs, she is faced with the *immediate* reality of carrying and bearing a child against her will. At least two fundamental human rights are thus involved: The mother's autonomy over her own body, and her right to choose whether to bring a child into the world.[3]

It is difficult to overstate the importance of what the mother has at stake. In physical terms alone the thought of making a mother carry and bear a child against her will is not a pleasant one.[4] But the matter cuts much deeper than mere physical pain. Carrying and bearing a child may involve anxiety and trauma and great psychic pain. See Aarons (M.D.), "Therapeutic Abortion and The Psychiatrist," American J. Psychiat. 124:6, December 1967. Infrequently it results in suicide. *Id.* In some cases the child may be born deformed, or the birth may in this or other respects impair the physical and mental health of the mother. Poor families, with little ability to take advantage of means of self-protection that are of easy access to the rich, see, e. g., Griswold v. Connecticut, 381 U.S. 479, 503, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1964) (concurring opinion of Mr. Justice White), often suffer physical, and therefore possibly other kinds of deprivation by the constant birth of children. But perhaps most important, the birth of a child unalterably affects the emotional lives of both mother and child. At its best, it makes possible a relationship of love; at its worst, it creates an unwanted child. When the State seeks to touch the very core of a person's being in such a fashion, and to thrust upon mother and (potential) child such a relationship *by force*, it violates "those 'fundamental principles of liberty and justice which lie at the base of all our civil and political in-

3. The majority argue that the right to abortion cannot be equated with the general right to choose whether or not to bear a child since alternative means are available to prevent conception. This argument is unrealistic. More than a million women found it necessary to have abortions last year (Life Magazine, Feb. 27, 1970). Kinsey found that 22% of the married women interviewed had had one or more abortions by age 45. Abortion in the United States, 50, 54 (Calderon ed. 1958). Between 88 and 95% of the premarital pregnancies in his sample resulted in abortion. Obviously there are great numbers of women who, for one reason or another, are not able to utilize alternative methods. See Griswold v. Connecticut, 381 U.S. 479, 503, 85 S.Ct. 1678, 1692, 14 L.Ed.2d 510 (1964) (concurring opinion of Mr. Justice White).

4. The authority for the idea that the Constitution extends significant protection to a person's sovereignty over his own body extends back as early as 1891, when the Supreme Court stated:

> "No right is held more sacred, [n] or is more carefully guarded * * * than the right of every individual to the possession and control of his own person, free from all restraints or interference of others unless by clear and unquestionable authority of law. As well said by Judge Cooley, 'The right to one's person may be said to be a right of complete immunity: to be let alone.'"

Union Pacific Railroad v. Botsford, 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734 (1891).

Of course the right has limits. In Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1904), for example, the Supreme Court upheld a compulsory vaccination law. The lengths to which the Court went, however, to justify a shot in the arm point up the degree to which personal autonomy is entitled to protection.

stitutions * * *.' [citation omitted]." *Griswold, supra,* 381 U.S. at 493, 85 S.Ct. at 1687 (concurring opinion of Mr. Justice Goldberg). As Mr. Justice Brandeis said, dissenting in Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928):

"The protection guaranteed by the [Fourth and Fifth] amendments is much broader in scope. The makers of our Constitution undertook to secure conditions favorable to pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men." [5]

That the State in these circumstances bears a heavy burden of proof to justify the law is beyond doubt.[6] Louisiana urges upon us the protection of human life, a claim which bears examining. Meanwhile, however, both parties have confused the matter by their use of the science of biology.

## II

### *The Relevance of Biology*

The biological evidence presented in this case suggests that some sort of human organism exists from the time of conception.[7] The parties, however, would go further and make biology conclusive, for both court and legislature, as to the existence or non-existence of a "human being" at the time of conception. These efforts seem misplaced.

The meaning of the term "human being" is a relative one which depends on the purpose for which the term is being defined. To the scientist a "human being" may be no more than union of sperm and egg; to the poet or to society as a whole the term may connote something else.[8] Science at best marks the

5. This passage is quoted in Mr. Justice Goldberg's concurring opinion in *Griswold, supra* at 550, 85 S.Ct. 1678 and by Mr. Justice Harlan in his dissent in Poe v. Ullman, 367 U.S. 497, 550, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961).

6. See Part III of this opinion.

7. Compare the following excerpt from the cross-examination of Dr. Christopher Tietze, an expert witness in the field of medicine (TR. 14, 2):
"Q. Dr. Tietze, I do not mean to keep quarreling with you, but you keep referring to a human person and under your definition of a human person, you may well be right. I have asked you in my question with regard to a human being, is the embryo a human being in an earlier state of development of the fetus?"
"A. If you will define, if you are referring, apparently to a human being as something begotten by man and potentially to become man, yes, it would be an early stage of a human being. But this is a very special definition and I think an essential one to the discourse between you and me."
 * * * * *

"Q. It is also fair to say that this zygote is an organism of the same gene structure of a fully-grown, highly complex adult?"
"A. It has the same, yes * * *."

8. Cross-examination of Dr. Christopher Tietze, TR. 4–5:
"Q. Now, with regard to this zygote which is an early embryo, which is an early fetus, in biological terms, would it be not a fair statement to say that this is a human being?"
"A. I think we are getting ourselves, now, into a philosophical question. I would say as a close approximation to my own reaction to this thing—and that is what we all must do, is face philosophical conceptions—that it is a potential human being and I would not refer to the zygote as an early embryo, I would refer to the zygote as a potential embryo."
 * * * * *
"Q. You injected the word philosophical, philosophy, and I ask you from a biological standpoint, isn't this zygote, this embryo, this fetus a human being?"
"A. I think the term human being, with all of its connotations, extends far beyond biology and is a philosophical con-

outermost limits of life; it cannot tell us nearly so well what a human being *is* as it can what a human being definitely *is not*. The Romans, for example, practiced infanticide with indifference.[9] No doubt the science of the Romans regarded the infant as a human being; but can one say the Romans did?

Present practice as well shows the futility of attempting to frame the question in terms of absolutes.[10] In Louisiana, for example, a mother who intentionally destroys her own fetus is guilty of no criminal offense, see, e. g., Simmons v. Victory Indus. Life Ins. Co., 18 La.App. 660, 139 So. 68 (Orleans Ct.App.1932); however, the moment the infant is born, the same act is punishable by the penalty "which the law exacts in all such cases, which penalty is death." State of Louisiana v. Burks, 202 La. 167, 11 So.2d 518, 520 (Sup.Ct.La.1942); La.Rev.Stat. Ann. 14:30 (1950).

The question in this case, then, is not the abstract one of whether a fetus is a "human being," but the more concrete one of the extent to which human value has been assigned to the fetus by *Louisiana*. We must analyze the precise nature of the State's interest in the fetus to determine whether, a part from the "label" it carries, it is in *substance* the kind of interest which is "compelling" and which "subordinates" the rights of the mother. Griswold v. Connecticut, 381 U.S. 479, 496, 504, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).[11]

cept. If you ask me whether the zygote normally in the course of circumstances, with exceptions, will develop into a human being, obviously the answer is yes. Whether this human being meets all of the other qualifications that we attach to this important term, I submit, is not a question of biology * * *."

\* \* \* \* \*

"A. * * * To be a human person in any society is something conferred to an individual by his fellow citizens. In some societies, a child was not a human person, in the sense that his parents could do away with him at will * * * I think what we call a human person is an imputed quality, a quality conferred by the society * * *."

Compare the following statement of Mr. Justice Clark:

"To say that life is present at conception is to give recognition to the potential, rather than the actual. The unfertilized egg has life, and if fertilized, it takes on human proportions. But the law deals in reality, not obscurity—the known rather than the unknown. When sperm meets egg life may eventually form, but quite often it does not. The law does not deal in speculation. The phenomenon of life takes time to develop, and until it is actually present, it cannot be destroyed. Its interruption prior to formation would hardly be homicide, and as we have seen, society does not regard it as such. The rites of Baptism are not performed and death certificates are not required when a miscarriage occurs. No prosecutor has ever returned a murder indictment charging the taking of the life of

the fetus. This would not be the case if the fetus constituted human life." Loyola of L.A.Rev., vol. 2 (1969).

9. Comment, To Be Or Not To Be: The Constitutional Question of the California Abortion Law, 118 U.Pa.L.Rev. 643, 653, n. 60 (1970) (citing J. Noonan, Contraception, 85–87 (1965).

10. "* * * In the ultimate analysis Catholics do not differ from advocates of easy abortion because Catholics hold that a human life is present in the fetus from the earliest moment of its existence. Catholics differ with their opponents rather over the nature and quality of the reasons which can justify an abortion. Utilizing the traditional principles of moral theology Catholic thought justifies at least the termination of an ecoptic pregnancy and the unintended destruction of a fetus when the removal of a uterus is medically required. Catholics therefore should move away from any line of reasoning or species of rhetoric which suggests that the proponents of abortion are advocating homicide. Catholics should delimit the question to the more precise issue involved, namely, the nature of the reasons which can furnish a moral justification for the termination of the existence of the fetus."
Robert F. Drinan, The Morality of Abortion Laws, Association for the Study of Abortion, Inc., Reprint 1 (1968). (Father Drinan was the Dean of the Boston College Law School, and has just been elected to Congress).

11. Concurring opinions of Mr. Justice Goldberg and Mr. Justice White.

## III

### The Louisiana Abortion Statute

The opinion of the majority reads very much as though this were a case involving the validity of an ordinary police measure. Every doubt is resolved in favor of the law. Normally, of course, this is as it should be when the serious question of the constitutionality of legislation is raised. But "Surely the right involved in this case * * * 'come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive from shifting economic arrangements.' Kovacs v. Cooper * * * (opinion of Frankfurter, J.)." Griswold v. Connecticut, 381 U.S. 479, 502, 85 S.Ct. 1678, 1691, 14 L.Ed.2d 510 (1965) (concurring opinion of Mr. Justice White).

"Where there is a significant encroachment upon personal liberty," the presumption of constitutionality is reversed, and "the *State* may prevail only upon *showing* a subordinating interest which is compelling." *Griswold, supra,* at 504, 85 S.Ct. at 1692 (concurring opinion of Mr. Justice White) (emphasis added). I take it then that the State has the burden of proof, see, e. g., Shapiro v. Thompson, 394 U.S. 618, 634–638, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969);[12] Sherbert v. Verner, 374 U.S. 398, 406–

407, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963);[13] Bates v. City of Little Rock, 361 U.S. 516, 525–527, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960);[14] Skinner v. State of Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942),[15] or that, at the very least, the fundamental rights at stake here

"require particularly careful scrutiny of the State needs asserted to justify their abridgment." Mr. Justice Harlan, dissenting in Poe v. Ullman, 367 U.S. 497, 543, 81 S.Ct. 1752, 1777, 6 L.Ed.2d 989 (1961)

I turn to the statute [La.Rev.Stat.Ann. § 14:87 (Supp.1970)]:

"87. ABORTION

Abortion is the performance of any of the following acts, with the intent of procuring premature delivery of the embryo or fetus:

(1) Administration of any drug, potion, or any other substance to a female; or

(2) Use of any instrument or any other means whatsoever on a female.

Whoever commits the crime of abortion shall be imprisoned at hard labor for not less than one nor more than ten years." As amended, Acts 1964, No. 167.

12. At pp. 634–637, 89 S.Ct. at pp. 1331–1333 the Court analyzes the State's asserted justifications for the residency requirement for welfare and finds that they are "plainly belied" by the facts (p. 635, 89 S.Ct. p. 1332) and will not "withstand strict scrutiny." (p. 636, 89 S.Ct. p. 1332)

13. "It is basic that no showing merely of a rational relationship to some colorable State interest would suffice; in this highly sensitive constitutional area, 'only the gravest abuses, endangering paramount interests, give occasion for permissible limitation' * * *." (p. 406, 83 S.Ct. p. 1795).
At p. 407, 83 S.Ct. at p. 1795 the Court referred to the "asserted state interest" and concluded that "Nor * * * would the record appear to sustain it." (emphasis added)

14. "It cannot be questioned that the governmental purpose upon which the municipalities rely is a fundamental one. No power is more basic to the ultimate purpose and function of a government than is the power to tax. * * * But governmental action does not automatically become reasonably related to the achievement of a legitimate and substantial governmental purpose by mere assertion in the preamble of the ordinance. When it is shown that state action threatens significantly to impinge upon constitutionally protected freedom it becomes the duty of this Court to determine whether the action bears a reasonable relationship to the achievement of the governmental purpose asserted as its justification." (p. 524, 80 S.Ct. p. 417)

15. "Strict scrutiny [of state sterilization law] is essential * * *."

Defendants urge again and again in their brief, and the majority of this court accept, the proposition that we are here dealing with a statute whose purpose is the protection of "human life." If this is true it is certainly not apparent from the statute itself. Unlike, for example, the Wisconsin statute,[16] which specifically refers to the "life" of an unborn "child," and defines "unborn child" as "a human being from the time of conception until it is born alive," the Louisiana statute makes no reference to "human life;" it refers only to the "embryo or fetus." [17] In Wisconsin the crime of abortion consists of "intentionally *destroy[ing]* the life of an unborn child." (emphasis added) In Louisiana, on the other hand, the crime consists of performing various acts on a "female" for the *"purpose* of procuring *premature delivery."* (emphasis added). Thus in Wisconsin no crime is committed unless the life of the fetus is actually terminated. In Louisiana, "[The abortion statute] does not use the word 'attempt,' but penalizes the felonious administration of any drug, potion, or anything to any woman, for the purpose of procuring abortion or premature delivery, and prescribes *only one penalty*. Hence Section 807 makes no distinction between the attempt and the actual procurement of abortion or premature delivery." State of Louisiana v. Mauvezin, 136 La. 746, 67 So. 816 (1915) (emphasis added). So far as I have been able to determine, abortion is the only crime in Louisiana in which there is no distinction between an attempt and commission of the substantive crime.[18] (Indeed the "attempt" in Louisiana *is* the substantive crime). In past versions of the statute the subject of an abortion was a "pregnant" [19] female; in 1964 the legislature decided that any "female" would do. Finally, it is not even certain whether an intent to terminate fetal life is necessary for a conviction under the Louisiana statute. The 1870 statute, as

16. Wis.Stat. § 940.04:
"(1) Any person, other than the mother, who intentionally *destroys* the *life* of an unborn *child* may be fined not more than $5,000 or imprisoned not more than 3 years or both.
(2) Any person, other than the mother, who does either of the following may be imprisoned not more than 15 years:
(a) intentionally destroys the *life* of an unborn quick child; or * * *
(6) In this section 'unborn child' means a *human being* from the time of conception until it is born alive." (emphasis added)

17. Compare La.Rev.Stat.Ann. § 14:29, entitled "Homicide," which provides in part:
"Homicide is the killing of a *human being* * * *." (emphasis added)
and La.Rev.Stat.Ann. § 14:30, entitled "Murder," which reads in part:
"Murder is the killing of a *human being* * * * [with *specific intent to kill*] * * * whoever commits the crime of murder shall be punished by death."

18. Compare La.Rev.Stat.Ann. § 14:27, entitled "Attempt," which provides in part:
"Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of or tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; * * *
Whoever attempts to commit any crime shall be punished as follows:
(1) If the offense so attempted is punishable by death or life imprisonment he shall be imprisoned at hard labor for not more than twenty years;
(2) If the offense so attempted is theft or receiving stolen things, he shall be fined not more than than two hundred dollars, or imprisoned for not more than one year, or both;
(3) In all other cases he shall be fined or imprisoned, or both, in the same manner as for the offense attempted; but such fine or imprisonment shall not exceed one-half of the largest fine, or one-half of the longest term or imprisonment prescribed for the offense so attempted, or both."

19. The 1942 version of the statute, La.Rev. Stat.Ann. § 14:87, read in pertinent part:
" * * * (1) Administration of any drug [etc.] * * * to a *pregnant* female; or
(2) Use of any instrument [etc] * * * on a *pregnant* female, * * *"
(emphasis added)

amended, La.Acts, 1888, No. 24,[20] prohibited certain acts with intent to procure an "abortion" *or* "*premature delivery*". (emphasis added). Today the statute does not even use the word "abortion" but simply the broader term "premature delivery."

Thus the Wisconsin statute at least purports to emphasize the life of the fetus; the Louisiana statute focuses more on an intent to interfere with nature irrespective of the fate of the fetus (or indeed of whether there even *is* a fetus). Along with "prostitution," "crimes against nature," etc. the crime of abortion in Louisiana is an "Offense Affecting Sexual Immorality"[21] rather than an "Offense Against The Person."[22] The provision of the Criminal Code immediately following Abortion, entitled "Distribution of Abortifacients,"[23] provides *one penalty* for distribution of abortifacients *or contraceptives*[24] (Cf. Baird v. Eisenstadt, 1 Cir., 1970, 429 F.2d 1398: "We are led inevitably to the conclusion that * * * it is contraceptives *per se* that are considered immoral * * *.")[25]

---

20. "Whoever shall feloniously administer, or cause to be administered, any drug, potion, or any other thing, to any woman for the purpose of procuring a *premature delivery*, or whoever shall administer, or cause to be administered, to any woman pregnant with child, any drug, potion, or any other thing, for the purpose of procuring *abortion* or a premature delivery, or whoever by any means whatsoever shall feloniously procure abortion or premature delivery, shall be imprisoned at hard labor for not less than one nor more than ten years." (emphasis added)

21. La.Rev.Stat.Ann. § 14:80–89.

22. La.Rev.Stat.Ann. § 14:29–50.

23. La.Rev.Stat.Ann. § 14:88.

24. "We call your attention to Act 95 of 1920, [the predecessor of the present Abortifacient Statute, note 19 *supra*] which is an Act to prohibit the printing or publishing of an advertisement of any secret drug for the use of females for the procurement of abortion or prevention of conception * * * We are therefore of the opinion that birth control in any form would fall within the criminal statutes now in force in this state."
Op.Atty.Gen. of La. 128, 129 (1932–1934). See also Ops.Atty.Gen. of La. 73 (1934–1936); Comment, 23 La.L.Rev. 773, 775 (1963).
The framers of the 1942 Criminal Code were aware of this interpretation of the law at the time they re-enacted it, see Morrow, The Louisiana Criminal Code of 1942—Opportunities Lost and Challenges Yet Unanswered, 17 Tul.L.Rev. 1, 22 (1942) (Morrow was one of the principal reporters of the Code).

25. H. L. A. Hart has distinguished between "public" and "private" morality in the criminal law. "Public" morality involves actions that are harmful independent of their repercussion on the general moral code. Rape is an example. "Private" morality involves actions that are not harmful to others but offensive to prevailing (or sometimes not so prevailing) moral feelings. Examples are fornication or consenting homosexuality. As Hart puts it, a particular practice violates private morality "if the thought of it makes the man on the Clapham omnibus sick." 62 Listener 162, 163 (July 30, 1959).

In John Stuart Mill's view government has no business enacting *private* morality into the criminal law:
"The only purpose for which power can be rightfully exercised over any member of a civilized community against his will is to prevent harm to others. His own good, either physical or moral, is not sufficient warrant."

*On Liberty.*

The British government has adopted Mill's position. See Report of the Committee on Homosexual Offenses and Prostitution (Wolfenden Report) 9–10, 20–21, 24, 79–80 (1957). So has the American Model Penal Code, see Tentative Draft No. 4, Comments to Article 207, Sexual Offenses. In the United States, however, courts often affirm—almost always in dictum—the propriety of statutes against fornication, etc. See e. g., Griswold v. Connecticut, 381 U.S. 479, 498–499, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (concurring opinion of Mr. Justice Goldberg). But where fundamental rights are involved, as they are in this case, private morality alone cannot justify their abridgment:
"The mere assertion that the action of the State finds justification in the controversial realm of morals cannot justify alone any and every restriction it im-

Concern for the protection of human life, then, is hardly manifest from the face of the statute.[26] In actual operation the statute fares even worse. Since 1870, when the abortion law was first enacted, there have been no more than four reported decisions of prosecutions.[27] There are only two reported prosecutions subsequent to 1955. All of these prosecutions are against the "criminal" abortionist; as against the *physician* there are no reported decisions of prosecutions.[28]

Perhaps even more revealing, however, is the fact that the *woman* who submits to abortion is guilty of no criminal offense:

"It is true that a female who voluntarily becomes the subject of an abor-

tion, without justifiable medical reason, is guilty of a detestible and revolting offense against the laws of nature, which is universally condemned, but notwithstanding this, such woman is not guilty of any criminal offense known to the laws of this state." Payne v. Louisiana Ind. Life Ins. Co., 33 So.2d 444 (Orleans Ct. App.1948)

This is true even in the case where the woman intentionally aborts herself. Simmons v. Victory Indus. Life Ins. Co., *supra.* It may be argued that the reason for exempting the mother is to encourage her to testify against the "abortionist." But surely this puts the cart before the horse. Suppose, for example, that A hires B to kill C; would the State

poses." Poe v. Ullman, 367 U.S. 497, 545, 81 S.Ct. 1752, 1778, 6 L.Ed.2d 989 (1961) (dissenting opinion of Mr. Justice Harlan). See also Baird v. Eisenstadt, *supra.*

26. Both parties seek to show the State's interest or lack of it in the fetus by pointing to various succession laws. One statute, for example, says that children in the womb are considered as already born and that an inheritance may "devolve" to them before their birth. La.Civ.Code Ann. Art. 29. See also La.Civ.Code Ann. Art. 954. But the right to inherit does not vest unless or until the child is "born alive," La.Civ.Code Ann. Arts. 956–957, and "children born dead are considered as if they had never been born or conceived." La.Civ.Code Ann. Art. 28.

In my view the succession laws are of doubtful relevancy to the abortion statute; at any rate they are too contradictory to support the argument of either party.

27. State of Louisiana v. Sharp, 248 La. 865, 182 So.2d 517 (1966); State of Louisiana v. Pailet, 246 La. 483, 165 So. 2d 294 (1964); State of Louisiana v. Dore, 227 La. 282, 79 So.2d 309 (1955); State of Louisiana v. Mauvezin, 136 La. 746, 67 So. 816 (1915).

Compare the "Gambling" statute, La. Rev.Stat.Ann. § 14:90, under which there have been at least 50 reported prosecutions. "Sodomy" (Abortion's bedmate in the Code) has even resulted in a greater number of reported prosecutions.

28. The absence of reported cases is not the only evidence of failure to prosecute the physician:

"The lack of enforcement was noted in 1868, H. Storer & F. Heard, Criminal Abortion 136–147 (1868), and has continued to the present, *see* L. Lader, Abortion 70–73 (1966); Ziff, Recent Abortion Law Reforms (Or Much Ado About Nothing) 60 J.Crim.L.C. & P.S. 3, 8 (1969)." 118 U.Pa.L.Rev. 643, 657, n. 87 (1969).

Speaking of the considerations that Dr. Belous might have weighed in deciding whether or not to perform an abortion in California one writer could blithely conclude "Considering the fact that the possibility of criminal prosecution and loss of practice is rarely realized. * * *" *Id.*

And here in Louisiana Professor C. J. Morrow, to whom defendants refer in their brief as "one of the principal redactors of the Criminal Code," has observed as a fact what the lack of reported prosecutions reflect:

*"It is common knowledge that abortions of all types are performed every day, and that there are no criminal prosecutions. This is true because there is obviously common popular acceptance of the practice, in spite of the theoretical disapproval in some quarters. However the tremendously unfortunate aspect of the situation is that under the present state of the law doctors are forced into either open defiance of the positive law in what they deem to be justifiable cases, or into clandestine practice under substandard conditions."* Morrow, The Louisiana Criminal Code of 1942—Opportunities Lost and Challenges Yet Unanswered, 17 Tul.L.Rev. 1, 22 (1942) (emphasis added).

grant A immunity in exchange for his testimony against B? If abortion is truly regarded as the destruction of human life, the mother is the principal criminal; the "abortionist" is merely her paid executioner. If the State really means to protect the life of the fetus why does it fail to deter the person most directly responsible for taking it? Save for the instigation of the mother the "criminal abortionist" would not exist. Finally, why is the woman who aborts herself immune? Perhaps it will be argued that otherwise she may be afraid to seek medical help if injury results; but this proves only that the health of the mother is considered more important than the preservation of the fetus.[29]

See *conclusion "2", infra.*

The conclusions I draw from the foregoing facts are as follows:

(1) In practice the efforts of the State on behalf of the fetus belie the claim of a compelling state interest. Abortion actually occurs on a massive scale in the United States—estimates run between one and three million per year. Yet there is no significant attempt at deterrence. "Lamented" by some, "decried" by others, the fact remains that the phenomenon of abortion is ignored by most. The fetus in Louisiana is shielded neither from mother nor physician by the criminal law; rather the mother is shielded (rather imperfectly) from the quack. Abortion is thus a singular "crime" in our law; it is a crime without a criminal. A poor person who may steal for the most pressing human needs is branded as a "thief" and punished by the criminal law—often severely. This comes as no surprise: Our society holds the institution of private property in high regard; he who tampers with it does so at his peril. A mother, however, may take the life of her fetus at pleasure so far as

the criminal law is concerned. In practice, so may a licensed physician. Surely the remarks of Mr. Justice Frankfurter in the Connecticut Birth Control case are relevant here:

"* * * The undeviating policy of nullification by Connecticut of its anti-contraceptive laws throughout all the long years that they have been on the statute books bespeaks more than prosecutorial paralysis. * * * Deeply embedded traditional ways of carrying out state policy * * *—or not carrying it out—are often tougher and truer law than the dead words of the written text." Poe v. Ullman, 367 U.S. 497, 502, 81 S.Ct. 1752, 1755, 6 L.Ed.2d 989 (1961)

(2) The statute is irrational and self-contradictory, a menace to public health without serving any compensating public need. As previously noted prosecution seems to be almost exclusively against the quack and not the physician. Since the crime, *qua fetus,* is equally great when committed by a physician *the enforcement* of the statute manifests little or no concern for the fetus but rather an overriding concern for the protection of the safety and health of the mother. Yet the menace to public health is clearly the product of the statute itself. The statute's primary effect is not to prevent or deter abortion, see "Conclusion (1)," *supra,* but simply to make it unsafe. Can it be said that there is a "reasonable relation between the prohibition * * * and the protection of the public health, education and welfare"? Sperry & Hutchinson Co. v. Director, 307 Mass. 408, 418, 30 N.E.2d 269, 275 (1940), or that the statute "bears a reasonable relation to a proper legislative purpose * * *." Nebbia v. New York, 291 U.S. 502, 537, 54 S.Ct. 505, 516, 78 L.Ed 940 (1934); Meyer v. Nebraska, 262 U.S. 390, 399–400, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)?

---

29. Compare the child battering cases. One of the reasons heavy penalties sometimes are not imposed is to encourage the child batterer to seek medical help for the child. Thus low penalties are no indication that the crime is taken lightly but rather that the need to protect the welfare of the child is balanced against the need to punish the child batterer. In the situation where the mother aborts herself, however, if any balance is struck it is struck in favor of the mother, not the child.

(3) The statute inflicts cruel and unusual punishment on the mother and violates equal protection of the law. As pointed out, the State does not attempt to deter abortion by imposition of criminal sanctions directly on the principal actor—the mother. At the same time, however, it makes it illegal for anyone else to perform an abortion. This of course has the effect of raising the price of abortion at all levels of skill. Thus to the extent that the statute deters the mother, it does so only by putting safe abortion beyond her means or by making her risk serious bodily injury at the hands of a relatively low-priced unskilled abortionist.

In Baird v. Eisenstadt, *supra.*, the Court of Appeals for the First Circuit held that it was impermissible for Massachusetts, through its anti-contraceptive law, to pursue a policy of deterring fornication "by making the penalty a personally, and socially, undesired pregnancy." The present case is probably distinguishable from *Baird*. I do not think the legislature *intended* [30] to encourage women to risk their health and lives; but because the statute makes abortion illegal for everyone but the mother it works precisely that result.

This purposeless suffering which the statute brings about is made all the more intolerable by the fact that its victims are primarily the poor:

"The present law places an unfair discrimination on the poor in that persons with money may obtain safe abortions either by travelling to other jurisdictions, by going to high priced competent though illegal abortionists, or by obtaining legal abortions here based on 'sophisticated indications.'" Report of the Governor's Commission Appointed to Review New York State's Abortion Laws, 17 (Mar.1968)

Deaths and maiming from abortion by nonmedical means such as soaps, chemicals, knitting needles, coathangers, etc., appear to be the basic if not the exclusive property of the non-white poor. Gold,[31] for example, shows that between 1960–62 in New York City abortion accounted for 55.5%, 49.4% and 25.2% respectively of the Puerto Rican, nonwhite and white puerperal death rates. Gold does not report figures for injury short of death, but one can imagine the toll they must take in the ghetto.

---

**30.** But see defendant's brief: "Plaintiff also argues that the statute prohibiting abortions forces women to take 'coat hangers and knitting needles' * * * and that this could be corrected by repealing or holding the statute unconstitutional. It is argued that forcing women to go to unskilled abortionists is more of a danger to their health. This is a specious argument. *It is neither necessary nor proper for society to remove obstacles that are in the way of the criminal in order to make it easier to commit the crime.*" (emphasis added)

**31.** Gold, Erhardt, Jacobziner & Nelson, Therapeutic Abortions in New York City: A Twenty Year Review, 55 Am.J.Pub. Health 964 (1965); see also Note, Abortion and the Law: A Proposal for Reform in Louisiana, 43 Tul.L.Rev. 834, 836–837 (1969):

"Because the demand for abortion cannot be met within the existing legal framework, illegal means are increasingly employed. For an affluent woman, able to pay a fee of $300 to $600, skilled physicians willing to work outside the law are available. [Citing Time, vol. 90, Oct. 13, 1967 at 33] Indeed in Miami alone abortionists collected $20,-000,000 for their services in 1967 * * * [citing Time, *supra*].

Since hospital abortions are generally unavailable to precisely those persons who are unable to afford the expensive and illegal private abortions the less affluent are forced to resort to the unskilled. [citing L. Lader, *Abortion* (1967)] Obviously the greater proportion of the more than 1,000 deaths annually due to abortions [citing Time, *supra*] occur among these expectant mothers. However, the annual death toll is only a small part of the social cost of such a system. To the death toll must be added thousands of women crippled by infection, thousands whose sexual organs are damaged so that they are unable to achieve normal sexual satisfaction, and thousands rendered irreversibly barren [citing Time, *supra*]. These, then, are the results of the prevailing American solution to the problems posed by abortion."

If the penalty is built-into the statute, so is the discrimination. *Cf.* Griswold v. Connecticut, 381 U.S. 479, 503, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965);[32] Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).[33] See also note 31, *supra*. By making abortion legal for the mother, but illegal for anyone else, the statute's *sole* effect on the mother is to raise the price of abortion. Abortion becomes less available to the degree to which one is not able to afford the "tax." For some the higher price is not an obstacle; for others it is either prohibitive, or, to the extent to which forces them to go to the less skilled practitioners (or to abort themselves), highly dangerous. If criminal sanctions were applied to well-off and poor women alike (not just in theory but in practice), as well as to the "abortionist," the increased price of abortion would be an *additional* (as well as unavoidable) deterrent, *but not the only one.* But the Louisiana statute does not deter rich and poor alike by equal application of the criminal law; it simply makes safe abortion less available to the poor than it would otherwise be. The person with means remains perfectly free to procure a high-priced safe abortion without fear of criminal sanction. This discrimination is therefore far more than an unequal side-effect of an otherwise equal law. The law itself is unequal. It is a *direct* discrimination against the poor, a gross violation of this country's

"pledge of the protection of equal laws." Yick Wo v. Hopkins, 118 U.S. 356, 369, 68 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886). Moreover, since the discrimination affects the most fundamental human rights —either by denying abortion to the poor altogether or by subjecting them unequally to risks of life and limb—"*strict* scrutiny * * * is essential, lest *unwittingly, or otherwise* invidious discriminations are made against groups or types of individuals in violation of the constitutional guarantee of just and equal laws." Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (compulsory sterilization law) (emphasis added). See also note 32, *supra*. Many women lose the use of their sexual organs as a result of the abortion laws, see note 31, *supra*, just as did the habitual criminals in *Skinner*. I would hold the statute invalid on the ground of equal protection alone.

(4) The abortion statute neither has a clear purpose to protect fetal life, nor is there good reason to believe it significantly does so in fact. (except, perhaps, where the poor are concerned). See "Conclusions (1) and (3)," *supra*, text at notes 26–29, *supra*, Abortion and the Law 23 (Smith ed. 1967); *Cf.* Griswold v. Connecticut, *supra*, 381 U.S. at 498, 85 S.Ct. at 1689.[34]

These, then, are the weighty State "interests" for which the mother must suffer and, in an estimated 8,000 cases last year, die. I must dissent.[35]

32. "And the clear *effect* of these statutes, *as enforced,* is to deny disadvantaged citizens of Connecticut, those without either knowledge or resources to obtain private counseling, access to medical assistance and up-to-date information in respect to proper methods of birth control * * *. In my view, *a statute with these effects bears a substantial burden of justification when attacked under the Fourteenth Amendment.* Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 * * * Skinner v. State of Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, [86 L.Ed. 1655] * * *." (emphasis added) (concurring opinion of Justice White).

33. " * * * strict scrutiny * * * is essential, lest *unwittingly or otherwise* in-

vidious discriminations are made against groups or types of individuals in violation of the constitutional guarantee of just and equal laws. * * * " (emphasis added).

34. "[The State] says that preventing the use of birth-control devices by married persons helps prevent the indulgence by some in such extra-marital relations. The rationality of this justification is dubious, particularly in light of the admitted widespread availability to all persons in the State of Connecticut, unmarried as well as married, of birth control devices * * *." (concurring opinion of Justice Goldberg).

35. "But, as might be expected, we are not presented simply with this moral judg-

I attach as an appendix portions of the excellent opinion of Judge Clarence P. Cooper, which is otherwise not reported.

## APPENDIX

### IN THE CIRCUIT COURT OF THE SEVENTH JUDICIAL CIRCUIT OF THE STATE OF SOUTH DAKOTA, WITHIN AND FOR PENNINGTON COUNTY

| | |
|---|---|
| STATE OF SOUTH DAKOTA,<br>Plaintiff,<br>vs.<br><br>H. BENJAMIN MUNSON,<br>Defendant | MEMORANDUM DECISION<br><br>April 6, 1970 |

CLARENCE P. COOPER, Circuit Judge:

" * * * most of the abortion laws were passed in the so called 'Victorian' era, a time when moral and religious fervor against anything regarded as sinful, resulted in many laws governing morals and personal conduct. The South Dakota statute dates back to 1877. Most of these laws governing personal or private conduct, like the 'blue laws' have either been repealed or have not been enforced. The laws prohibiting abortion represented a change from the common law which permitted abortion in the initial stages of pregnancy, before quickening of the fetus. * * *

"According to reliable estimates, more than a million American women had abortions last year. Of these about 350,-000 needed hospital care when they attempted to abort themselves, and more than 8000 of these self-help cases died. (Life Magazine, Feb. 27, 1970) Enforcement of the abortion laws has been chiefly against quacks and charlatans who have botched the job, and the woman lived to complain. Where death ensues, the prosecution has been for homicide. It is a rare case when a licensed physician has been prosecuted. In no instances has the woman been prosecuted, although the abortion laws are directed equally against the woman seeking an abortion.

"With such massive disregard for the abortion law, reflecting a radical change in public attitude, it is in order to determine whether the exercise of the police power in prohibiting abortion is 'sanctioned by usage, held by prevailing morality to be necessary to public welfare, or endangers the vital interests of society', criteria which over the years have been used to measure the right of the State to regulate personal and private conduct. * * * "

ment to be passed on as an abstract proposition. The secular state is not the examiner of consciences: it must operate in the realm of behavior of overt actions, and where it does so operate, not only the underlying, moral purpose of its operations, but also the *choice of means* becomes relevant to any Constitutional judgment on what is done. The moral presupposition on which appellants ask us to pass judgment could form the basis of a variety of legal rules and administrative choices, each presenting a different issue for adjudication." Mr. Justice Harlan, dissenting, Poe v. Ullman, 367 U.S. 497, 547, 81 S.Ct. 1752, 1779, 6 L.Ed.2d 989 (1961).